CENTRAL TRUST CO. OF NEW YORK v. MUNICIPAL TRACTION
CO. et al.

(Circuit Court, N. D. Ohio, E. D.   February 26, 1909.)

1. FRANCHISES (§ 3*)—GRANTS OF FRANCHISES—CONSTRUCTION OF GRANT.
   Legislative or municipal grants of property, franchises, or privileges
   in which the government or public has an interest are to be construed
   strictly in favor of the public, and nothing passes by implication which
   is not granted in clear and explicit terms.
   [Ed. Note.—For other cases, see Franchises, Dec. Dig. § 3.*]

2. STREET RAILROADS (§ 28*)—FRANCHISE—RENEWAL OR EXTENSION OF GRANT
   BY IMPLICATION.
   A municipal ordinance, consenting to the consolidation of street rail-
   road companies operating a number of lines, the franchises for which ex-
   pired at different dates, although by the consolidation passengers acquir-
   ed the right to free transfers from one line to another, did not, in the
   absence of express provision therefor, have the effect of extending the
   franchise of any line beyond the term of the original grant to that line.
   [Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 28.*]

3. STREET RAILROADS (§ 28*)—FRANCHISE—EXTENSION BY IMPLICATION.
   The grant by a city council to a consolidated street railway company
   operating a number of lines of road, which were built under separate
   franchises expiring at different times, of the right to build extensions
   and connecting lines and to operate the same in connection with its
   other lines until a given date, did not operate to extend the franchises of
   such other lines or any of them until such date, where some of them by
   their terms expired earlier, and where no such intention was expressed.
   [Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 28.*]

## In Equity.

The receivers appointed by this court are operating the lines of the Cleve-
land Railway Company. This company is a consolidated company, embracing,
among other lines, those of the so-called "Woodland Avenue & West Side Street
Railroad Company." The present controversy arises over the question wheth-
er the franchises under which the lines of the old Woodland Avenue & West
Side Street Railroad Company are operated have expired; the city contend-
ing that the franchises in question terminated February 10, 1908; and the
railway company and its bondholders insisting that the grants will not expire
until July 1, 1914, and, in any event, not before January 26, 1910.  Upon the
determination of this question depends the question whether the receivers
shall be directed (as asked by the railway company and its creditors and bond-
holders) to charge a fare of 5 cents (or 11 tickets for 50 cents) over the Wood-
land Avenue and West Side lines (as permitted by the franchises for those
lines), or whether a fare of 3 cents is properly chargeable, as provided by the
ordinance granted to the Forest City Railway Company on April 16, 1908, un-
der the contention that the franchises of the Woodland Avenue and West Side
lines have previously expired.

Pending the decision of the question here submitted, the lines in question
are now being operated upon a three-cent basis.  The facts necessary to a de-
termination of the question presented are these:

In the year 1885 the Woodland Avenue Street Railway Company was being
operated under a franchise granted in 1879 to the Kinsman Street Railroad
Company, which by its terms would expire September 20, 1904.  The West
Side Street Railroad Company was then being operated under a franchise
limited by its terms to expire February 10, 1908.  The lines of these two com-
panies ran on opposite sides of the Cuyahoga river, meeting at the public
square.  These two lines were in 1885 consolidated into a system known as
the Woodland Avenue & West Side Street Railroad Company.  This consolida-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion continued until May 11, 1893, at which time the lines of the Woodland Avenue & West Side Street Railroad Company were consolidated with those of the Cleveland City Cable Railway Company; the latter consisting of three lines known as the St. Clair Street line, whose franchise would expire by its terms January 5, 1910, the Superior Street line, and the Payne Avenue line; the franchises of the two latter expiring January 26, 1910. These cable lines, which operated only on the east side of the river, met at the public square the lines of the consolidated Woodland Avenue & West Side Street Railroad Company. The lines thus consolidated (under the name of the Cleveland City Railway Company) embraced 62½ miles of railway.

In 1903 the lines composing the Cleveland City Railway Company were united with those of the Cleveland Electric Railway Company (a consolidated company formed in 1893, and known as the "Big Consolidated"); the consolidation being now called the Cleveland Railway Company, which is a defendant in this suit.

In the year 1906 the Supreme Court decided that, by virtue of ordinances passed subsequent to the consolidation of 1885, the common council of the city of Cleveland had clearly expressed an intention to extend the franchises of the Woodland Avenue lines until the termination of the grants to the West Side lines, viz., until February 10, 1908. See Cleveland v. Cleveland Electric Ry. Co., 201 U. S. 529, 26 Sup. Ct. 513, 50 L. Ed. 854. It is now the contention of the Cleveland Railway Company, and those claiming under it, that by the consolidation of 1893 and the subsequent extension and subsidiary grants the franchises of the entire Cleveland City Railway Company's system (thus embracing the Woodland Avenue and West Side lines) were extended at least until January 26, 1910, which was the date fixed by ordinance for the expiration of the Superior Street and Payne Avenue lines formerly a part of the cable company's lines. The acts which are thought to evidence the intention of the common council to extend the franchises in question to January 26, 1910, are these:

1. The consolidation agreement of 1893 and the resolution of the common council thereon: On May 13, 1893, the Woodland Avenue & West Side Street Railroad Company and the Cleveland City Cable Railway Company sent to the council a joint communication announcing their agreement to consolidate the lines of the two formerly separate companies into the Cleveland City Railway Company, to take effect June 1, 1893. The communication contained this statement: "It is proposed on June 1, 1893, to immediately issue proper transfers without extra charge so that passengers on any line of the Woodland Avenue & West Side Street Railroad Company may be transferred and have a continuous ride upon any line of the Cleveland City Cable Railway Company within the limits of the city of Cleveland, and also that passengers upon any line of the Cleveland City Cable Railway Company may be transferred and have a continuous ride upon any line of. the Woodland Avenue & West Side Street Railroad Company within the city of Cleveland, only one fare to be charged for such ride; and, as soon as the necessary improvements can be made, additional Cross-Town lines will be run, and only one fare charged for any continuous ride upon said additional lines within the city of Cleveland." On receiving this communication the city council passed the following resolution: "That the communication from the Woodland Avenue & West Side Street Railroad Company and from the Cleveland City Cable Railway Company, setting forth their consolidation into the Cleveland City Railway Company, be received; and that this council approve such consolidation upon the terms and conditions stated in such communication; and that such consolidated company shall be subject to all the ordinances or regulations now or hereafter in force." It is to be noted that neither in the communication from the railway companies to the council nor in the resolution of the common council approving the consolidation is there any suggestion of an extension of the life of the franchise of any of the lines embraced in the consolidation, nor is there any mention of a claim or of a consent that the consolidated company was to obtain, in any respect, any greater rights than then possessed respectively by the constituent companies forming the organization.

2. The Erie Street extension: On July 3, 1893, about one month after the consolidation, the common council passed an ordinance "granting permission

[as stated in its title] to the Cleveland City Railway Company to extend its tracks from Superior street along Erie street to St. Clair street." This extension was one city block in length, from the Superior Street line (whose franchise would expire January 26, 1910) to the St. Clair Street line (whose franchise was by its terms limited to January 5, 1910). The Superior and St. Clair Street lines were part of the old cable company's lines included in the consolidation of June 1, 1893. The connection had thus no direct effect upon the Woodland Avenue and West Side lines here in question, except as those lines were, when the Erie Street extension ordinance was passed, part of the consolidated system known as the Cleveland City Railway Company. This ordinance granted permission to the Cleveland City Railway Company "to extend its double track street railroad on and along Erie street from its present tracks at the intersection of Superior and Erie streets, to the intersection of St. Clair and Erie streets, connecting its tracks on Superior street with its tracks on St. Clair street, with the necessary curves and also poles and overhead wires, and to construct and maintain said extension, and to operate the same by means of electricity as a motive power, upon the following terms and conditions." Sections 5, 6 and 8 are the only ones containing conditions deemed material to this controversy. Section 5 requires that the railway company shall "comply with and perform all the terms and conditions set forth" in the joint communication of the two companies announcing the consolidation, requires that the most approved cars and appliances be used upon all the company's lines, with the right in the council to require the company to operate its cars over the entire length of any of the lines or branches of the constituent companies in the same manner and between the same terminals as cars were operated prior to the consolidation of the constituent companies, and that night cars shall be operated throughout the entire length of each of the lines of the company at least hourly each way between midnight and 6 a. m., also, that the company be required to ·sprinkle between all its tracks on all its lines; the company agreeing "in consideration of the grant made by this ordinance" that "all the terms and provisions of this section (which was section 5 referred to) shall apply to and be a condition upon each and all of the grants heretofore made by the council under which the existing lines of street railroad now operated by the Cleveland City Railway Company have been constructed." Section 6 provides that "this grant shall be in force until the 26th day of January, 1910." Section 8 provides for the forfeiture "of this grant and the rights or privileges hereby granted" upon the failure or refusal of the company at any time to comply with and perform "all and singular the terms and conditions of this ordinance, or the general ordinances of the city relating to street railroads now or hereafter in force."

3. The Corwin Avenue and South Woodland Avenue grant: On July 17, 1893, the common council passed an ordinance "granting permission [as stated in its title] to the Cleveland City Railway Company to lay an additional track upon South Woodland avenue between Southern avenue and Corwin avenue and a double track street railway on said South Woodland avenue from Corwin avenue to Woodland Hills avenue." Section 1 contains the grant in substantially the language of the title, with specific authority "to construct and maintain said tracks and operate the same in connection with the other lines of street railroad now owned by said company with electricity, or the same motive power as is used upon other portions of its lines, upon the following terms and conditions." Section 6 expressly provided that "this grant shall be and remain in force until the 26th day of January, 1910," and section 8 makes the failure of the company to comply with the terms of the ordinance and other ordinances work a forfeiture "of this grant and the rights and privileges hereby granted." The other sections of the ordinance are, so far as material to this opinion, substantially the same as in the Erie Street extension ordinance. The extension provided by this ordinance was of the tracks of what had formerly been the Woodland Avenue & West Side Street Railroad Company.

4. The Ansel Avenue line: On March 12, 1894, the common council passed an ordinance (as shown by its title) granting permission to the Cleveland City Railway Company to "extend its tracks from Superior street in and along Ansel avenue to the city limits." Section 1 of this ordinance provides for the

operation by electricity and "in connection with the other lines of street railway owned, with the same motive power as is used upon other portions of its lines, upon the following terms and conditions"—which are substantially the same as in the Erie Street and Corwin Avenue extension ordinances, except: First, that in the Ansel Avenue ordinance no mention is made of the company's communication in connection with the consolidation; second, the provision for transfers is confined to the old cable company's lines, of which the extension formed a part; and, third, section 5 provided that "this grant shall terminate at the expiration of the other grants made to this company, to wit, January 26, 1910." This extension, it will be noted, was from certain tracks of the cable company (comprising lines in Superior street and Payne avenue), whose franchise would expire January 26, 1910, which was the date of expiration stated in section 5 of the Ansel avenue ordinance. This Ansel avenue line was never built.

The grant relied upon as extending the life of the Woodland Avenue and West Side grants to July 1, 1914, is this: On February 19, 1894, the council passed an ordinance (known as the Willson Avenue or Cross-Town ordinance), "granting permission [as stated in its title] to the Cleveland Electric Railway Company and the Cleveland City Railway Company to extend their tracks in Willson avenue." These two railway companies were at that time entirely independent of each other. The construction provided for was to be jointly made by the two companies. The Cleveland City Railway Company was granted permission "to extend its double track street railroad on and along Willson avenue from the present tracks at the intersection of Woodland avenue and Willson avenue (Woodland avenue being part of the Woodland Avenue & West Side system) to its present tracks at the intersection of Lexington and Willson avenues (the Lexington tracks being a part of the Superior lines of the old cable company); and from its present tracks at the intersection of Payne and Willson avenues (the Payne avenue tracks being part of the Superior line referred to) to the northerly terminus of said Willson avenue."

The Cleveland Electric Railway Company was granted permission to extend its double track street railway "on and along Willson avenue from its present tracks at the intersection of Scovill and Willson avenues to its present tracks at the intersection of Perkins and Willson avenues, and from its present tracks at the intersection of Hough and Willson avenues to the northerly terminus of said Willson avenue." The Scovill Avenue grant had been limited to expire January 26, 1910, and the Perkins Avenue line in 1914. Section 6 of the Willson Avenue grant provided that a passenger on any car operated on Willson avenue, on payment of one fare, should be entitled, without additional charge, to a transfer to any other line of either of the companies intersecting or coming to said Willson avenue. Section 10 provides "this grant shall be in force until the first day of July, 1914." Section 12 provides for a forfeiture of the grant created by the ordinance in question on failure or refusal of either of the companies to comply with its terms and conditions, or the general ordinances relating to street railroads.

W. B. Sanders and John G. White, for the Railway Company.

D. C. Westenhaver and Newton D. Baker, for the City of Cleveland.

KNAPPEN, District Judge (after stating the facts as above). In determining the effect upon the life of the franchises in question created by the action of the common council in approving the consolidation of 1893, and in the passage of the various subsequent extension ordinances, the principles governing the interpretation of such municipal acts must be had in mind. That the common council had power to make the claimed extensions is beyond dispute. It is equally beyond dispute that the council could effect such extension by ordinance previous to the expiration of the franchises sought to be extended. Cleveland v. Cleveland City Ry. Co., 194 U. S. 517, 24 Sup.

Ct. 756, 48 L. Ed. 1102; Cleveland v. Cleveland Electric Ry. Co., 201 U. S. 529, 26 Sup. Ct. 513, 50 L. Ed. 854.

The controlling question is one of the intention of the common council in taking the action invoked. The rule applicable to the ascertainment of that intention is that only that which is granted in clear and explicit terms passes by a grant of property, franchises, or privileges in which the government or the public has an interest. Statutory grants of that character are to be construed strictly in favor of the public. Whatever is not unequivocally granted is withheld, and nothing passes by implication. Knoxville Water Co. v. Knoxville, 200 U. S. 22, 34, 26 Sup. Ct. 224, 50 L. Ed. 353; Blair v. Chicago, 201 U. S. 400, 471, 26 Sup. Ct. 427, 50 L. Ed. 801; Cleveland Electric Ry. Co. v. Cleveland, 204 U. S. 116, 129, 27 Sup. Ct. 202, 51 L. Ed. 399.

In Knoxville Water Co. v. Knoxville, at page 34 of 200 U. S., at page 228 of 26 Sup. Ct. (50 L. Ed. 353), Mr. Justice Harlan, after announcing the proposition above stated, said:

"The authorities are all agreed that a municipal corporation, when exerting its functions for the general good, is not to be shorn of its powers by mere implication. If by contract or otherwise it may, in particular circumstances, restrict the exercise of its public powers, the intention to do so must be manifested by words so clear as not to admit of two different or inconsistent meanings."

In Blair v. Chicago, at page 471 of 201 U. S., at page 445 of 26 Sup. Ct. (50 L. Ed. 801), Mr. Justice Day, in speaking of certain legislative grants relied upon as sustaining public franchises, said:

"It may be that the very ambiguity of the act was the means of securing its passage. Legislative grants of this character should be in such unequivocal form of expression that the legislative mind may be distinctly impressed with their character and import, in order that the privileges may be intelligently granted or purposely withheld. It is a matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the Legislature with a view to obtain from such bodies the most liberal grant of privileges which they are willing to give. This is one among many reasons why they are to be strictly construed."

In Cleveland Electric Ry. Co. v. Cleveland, supra, Mr. Justice Peckham, in discussing certain ordinances, one of which is involved here, used this language:

"The rules of construction which have been adopted by courts in cases of public grants of this nature by the authorities of cities are, of long standing. It has been held that such grants should be in plain language, that they should be certain and definite in their nature, and should contain no ambiguity in their terms. The legislative mind must be distinctly impressed with the unequivocal form of expression contained in the grant 'in order that the privileges may be intelligently granted or purposely withheld' "—quoting the paragraph above set out in the opinion in Blair v. Chicago.

Applying the rules of interpretation above stated, we turn first to the consolidation of 1893. It is contended on the part of the railway company that because previous to the consolidation each of the two companies was operating independently, with no interchange of traffic, and as by the consolidation the public right to continuous passage for one fare over the entire line of the consolidated company was secured, the intention of the council is made manifest to author-

ize the operation of each of these consolidated lines to January 26, 1910, as being the date of expiration of the franchises having the longest time to run, viz., those of the Superior Street and Payne Avenue lines. This interpretation is, to my mind, without support upon either reason or authority. Advantageous as such consolidated operation might be, there is nothing in the action referred to announcing the intention of the common council to extend the lives of the franchises of the Woodland Avenue and West Side lines to the termination of the cable franchises. To hold otherwise would be to violate the rules of interpretation above invoked. To my mind, the only reasonable interpretation is that the two companies had the right to operate together so long as the franchises of those companies permitted. The cable company's lines could, after the termination of the franchises of the Woodland Avenue and West Side lines, be operated independently as well as they had been before the consolidation.

In Cleveland Electric Ry. Co. v. Cleveland, 204 U. S. 116, 139, 27 Sup. Ct. 202, 211, 51 L. Ed. 399, a contention that the termination of one of the lines of the Cleveland Electric Railway Company was postponed by a similar consolidation occurring in the same year (1893) was rejected; Mr. Justice Peckham saying:

"Nor do we think the time for the termination of the Garden Street branch was in any degree affected by the consolidation of the various roads in 1893. * * * Its intention to issue transfer checks, so as to have a continuous ride for one fare, gave no greater rights to the company than it theretofore had, nor did the resolution of the council, consenting to the consolidation on condition that but one fare should be charged for a continuous ride, give any greater rights to the consolidated company than each of the constituent companies had theretofore enjoyed. The consolidation does not require, in order to comply with the conditions specified in the resolution consenting to the consolidation, that the consolidated companies should be permitted to operate until the expiration of the longest grant to any of the companies. At the expiration of the grant to the Garden Street branch the operation of that road might terminate, while the operation of the rest of the consolidated roads could go on perfectly well."

The argument here presented, that the consolidation of the Cleveland City Railway Company operated to extend the franchises of each of the constituent companies for the life of the longest franchise, rests, to my mind, on no better foundation than did the same contention in the case of the Cleveland Electric Railway Company. The consolidation in each case was approved upon the same conditions. The only noticeable difference in the respective dealings between the city and the two consolidated companies is that in the communication to the council announcing the agreement of consolidation of what is known as the Cleveland Electric Railway Company there was an express disclaimer of any rights by virtue of the consolidation "greater than the constituent companies forming the organization," while in the communication made by the companies forming the Cleveland City Railway Company such disclaimer was omitted. The omission, however, is not significant, because there is nothing in the fact of the consolidation which necessarily implies a claim that the consolidated companies should be permitted to operate or intended to operate under such consolidation (without further authority) until the expiration of the longest grant to any of the companies.

As to the Erie Street extension: The argument made, in support of the proposition that by the granting of this extension the common council has clearly evidenced an intention to extend the life of each of the constituent lines until the termination of the grant to operate the extension, is: That the subject-matter of the ordinance is not merely the extension in question, but embraces the future operation of the entire consolidated lines; that through the burdens imposed upon the lines connected by the extension, and by the obligation imposed upon the company to perform all the terms and conditions of the contract engendered by the consolidation proceedings, a modification is effected of every ordinance and contract then existing between the railway company and the city, for which the latter thus receives a new consideration; that the council accordingly determined that all the lines must be operated together during the period provided for the operation of the extension, and so selected the date of termination of the franchise of the constituent company having the longest time to run, viz., January 26, 1910. This argument assumes that by the Erie Street extension ordinance the council imposed upon the railway company the absolute duty to operate all its lines in connection with the extension, as a part thereof, during the entire period of the Erie Street extension grant. Surely no such requirement is imposed in express terms. If imposed at all, it is only by implication. In my judgment the implication to that effect is by no means clear and necessary.

It is true that by the Erie Street extension grant additional burdens are imposed upon the other lines, but these obligations are imposed as conditions to the Erie Street grant. They are merely a part of the consideration paid by the railway company for the grant. The life expressed in the grant is of the grant thereby made, and not of the former grants to the constituent companies. Had the council intended to extend the life of the grants to each of the constituent companies, the natural course would have been to so state in express terms. Nor is the extension ordinance made a substitute for the franchises of either of the constituent lines. Failure to perform the conditions imposed by the grant in question is not declared to be to cause a forfeiture of any of the other grants, but it is expressly declared that the failure or refusal of the company to perform the terms and conditions of the extension ordinance shall work a forfeiture "of this grant and the rights or privileges hereby granted"; thus by natural implication leaving the other grants in the same condition they would have been but for the extension grant. The extension ordinance may not have assured the power to effectively operate the extension for the full period required by the grant unless the existing franchises of the other lines be extended; but it would be more in accord with the rules of interpretation of contracts of this nature to hold the franchise for the extension limited by the contingency of the subsequent renewal of the franchises for connecting lines, than to raise by doubtful implication an intention to extend the life of such other lines.

In my opinion the decision in Cleveland Elec. Ry. Co. v. Cleveland, 204 U. S. 116, 27 Sup. Ct. 202, 51 L. Ed. 399, supports this conclu-

sion. It seems impossible to believe that it would have occurred naturally to the minds of lay members of the common council that by granting this extension the life of the franchise of each constituent company was prolonged. There is nothing in the title of the ordinance suggesting such a purpose, and it is proper to consider the title in determining the intention of the council in passing the ordinance. If such can be held to be the effect of this extension, the public may lose valuable rights through what is, at most, an implication neither clear nor necessary. The language of Judge Tayler, in deciding against a similar contention of the Cleveland Electric Railway Company with respect to the Garden Street extension, is highly pertinent. Cleveland Elec. Ry. Co. v. Cleveland (C. C.) 137 Fed. 111, 125 and following.

There is, to my mind, nothing in the decision of either the Low Fare Case, 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102 or the 1904 Expiration Case, 201 U. S. 529, 26 Sup. Ct. 513, 50 L. Ed. 854, supporting the proposition that the effect of the Erie Street extension grant has been to prolong the life of the Woodland Avenue and West Side grants to the end of the Erie Street grant. In the Low Fare Case (involving agreements requiring that the consolidated lines be operated as one system and at one fare) three extension ordinances under consideration not only provided that a single fare be charged between points on the main lines and extensions, but in each of them there was express provision that the rights granted should terminate with the existing main line grant, to wit, on the 10th day of February, 1908, which was in fact the date of the expiration of the grant of the West Side lines then a part of the consolidated company. In respect to the decision in the 1904 Expiration Case, it is to be noted that by the ordinance of March 22, 1899, which authorized the equipment of the Woodland Avenue and West Side lines with electricity, it was expressly provided that "said company shall have the right to maintain and operate its present lines and any and all extensions until the expiration of the present grant to said company, to wit, the 10th day of February, 1908"—a date which was in fact the expiration of the franchises of the West Side lines. There was thus express language declaring an intention and purpose to extend the grant of the main line until February 10, 1908, not only in the ordinance last referred to, but also in the three ordinances before mentioned. Mr. Justice McKenna accordingly said:

"It (the language used by the city in the ordinance) recognized a main line not in one ordinance but many ordinances, and the purpose was to join the initial grant and its extensions together, and continue it, and those combined, until 1908. There could have been no mistake in the language used or misunderstanding of it. We might suppose a mistake in one ordinance, but we cannot suppose a mistake in four ordinances."

The contrast between the case presented here and that presented in the cases last referred to is, to my mind, sharply defined, for here there is an utter lack of express declaration of an intention to extend the franchise of the main line. The conclusion reached is that the Erie Street extension grant did not impose the duty upon, or create the right in, the railway company to operate the company's other lines

in connection with the extension longer than the lives of the existing grants of such other lines, viz., February 10, 1908.

As to the Corwin Avenue and South Woodland Avenue grant: This grant is of the right to construct an additional track and a double track extension, each for a short distance at the extreme outlying end of one of the Woodland Avenue lines. In the case of this grant, as in that of the Erie Street extension, there is no express declaration that the life of the grants of the constituent companies shall be extended during the period of the grant conferred by the extension ordinance. Here, as in the case of the Erie Street extension, such intent is left to be discovered, if at all, by implication. Here, again, the extension granted is not a substitute for the earlier grants to the constituent lines. The only respects, material to this decision, in which the grant in question may be thought to differ from the Erie Street grant, are these: First, the extension is of the Woodland Avenue lines rather than of the cable lines; second, the authority to operate the extension "in connection with the other lines of street railroad now owned by said company" is expressed, instead of being left to implication, as in the case of the Erie Street extension. The question of the effect of the Erie Street extension has been discussed on the theory that an operation of the extension in connection with the other lines was contemplated. The considerations advanced in this opinion as controlling the effect of the Erie Street extension equally forbid a distinction in favor of the grant under consideration merely from the fact of its connection with the Woodland Avenue line. Why the date of January 26, 1910, was selected as the date of expiration of the extension grant is not clearly apparent. It is quite as likely to have been inadvertently selected because contained in the Erie Street extension ordinance, which was substantially copied in this ordinance. The adoption of this date, to my mind, falls short of clearly showing an intention on the part of the common council to extend thereby the life of the Woodland Avenue and West Side grants.

It is urged that the decision of the Supreme Court in Cleveland Elec. Ry. Co. v. Cleveland, 204 U. S., at page 137, 27 Sup. Ct., at page 202, 51 L. Ed. 399, to the effect that it would be unreasonable to hold that a right to use the second or additional track was intended to be limited to a different time than that which existed with relation to the first track, is decisive of the proposition that the lives of the extension and the constituent lines were intended to expire at the same time. It seems sufficient to suggest that the remark referred to was made with respect to an express provision (in the grant of the right to operate a second track) that it should continue until the expiration of the grants for the company's main lines, and in connection with the determination of the meaning of the term "main line."

As to the Ansel Avenue line: This avenue was an outlying street, extending to the city limits. As appears by what has been before said, as to the terms of the ordinance, it affords less ground for an implication of an extension of previous grants to other lines than

either of the ordinances before considered.   Further discussion of this ordinance would seem unnecessary.

It is urged on behalf of the city that its intention not to extend (by the extension grants under consideration) the life of the other connecting lines is shown by an ordinance of November 12, 1900, for an extension of tracks in Hough avenue, by which ordinance the life of the extension is made to expire with that of the line extended; also by two ordinances of April 2, 1901, which provide that the right granted "shall terminate at the same date as the rights and privileges granted to said company for its lines" so extended.   As the three ordinances· last referred to were passed after the commencement of litigation in the Low Fare Case, they are not by this opinion taken into account.

It is also urged on behalf of the city that the understanding on the part of the railway company that the franchise of the Woodland Avenue and West Side lines expired in 1908 conclusively appears from the allegations in the original and amended bills of complaint filed in the Low Fare Case which was begun in 1898.   No estoppel, however, could well arise by reason of the taking of such position in the litigation referred to, and, while such admissions are not without weight, I prefer to place my decision upon a construction of the ordinances themselves, which are relied upon by the railway company as extending the life of the Woodland Avenue and West Side lines.

The conclusion I have reached is that the lives of those lines have not been extended by the action of the council with reference to either the consolidation of 1893, or the Erie Street or Corwin Avenue extensions, or the Ansel Avenue grant.

It remains to consider whether the Willson Avenue or Cross-Town ordinance of February 19, 1894, has extended the life of the Woodland Avenue and West Side lines to July 1, 1914.   It is the contention of the railway company that, inasmuch as this ordinance provides for the operation of the Cross-Town line in connection with the two other systems of railways then in operation, the intention of the council is clearly shown not only to permit, but to require, the operation of all the other lines of both systems· connecting with Willson avenue until the expiration of the Cross-Town grant, and thus to extend to July 1, 1914, the life of the franchise of every line of both of the two otherwise independent systems connecting with the Cross-Town line.

It will be noted that the title of the Cross-Town ordinance is limited to granting permission to the two otherwise independent companies "to extend their tracks in Willson Avenue."   It will also be noted that there is nowhere in the act any express language referring to the life of the grants of the connecting roads, and that the argument in favor of the extension of the life of the other lines is based entirely upon an implication alleged to arise from the facts that the other lines are to be operated in connection with the Cross-Town line, and that the life of the latter extended to July 1, 1914.   In my opinion no implication of the extension of the life of such other lines necessarily arises.   Much that has been already said with reference to the other ordinances is applicable to this ordinance.

The same proposition was presented to the Supreme Court in the case of Cleveland Elec. Ry. Co. v. Cleveland, and was there rejected; Mr. Justice Peckham saying (204 U. S., at page 141, 27 Sup. Ct., at page 212 [51 L. Ed. 399]):

"While the council consented to the extension by the complainant and the Cleveland City Railway Company of the line of railway in Willson avenue, and also to the operation of that line in connection with other lines of the consolidated company, which included the Garden Street branch, yet it cannot be held that there arose from that ordinance, when accepted by the company, a contract which should extend the time on all of the roads until the expiration of the grant contained in that ordinance, July 1, 1914. By such means an implied extension of time, affecting over 200 miles of track, as is stated, would be accomplished by making these conditions in regard to the Willson Avenue grant a substitute for a grant, in plain language, affecting the Garden Street branch. On the contrary, we think that the effect of that ordinance was simply to make it necessary for the Garden Street branch and the other roads, also, to comply with the conditions set forth in the ordinance until the expiration of their respective and existing grants, but that ordinance did not thereby extend the various other railroad grants by implication. There is no such connection between the various roads as to make it necessary, in order to operate one, that all the others should be in operation as a unit, and as comprehending one indivisible system. There is nothing in this record which shows any difficulty whatever in operating the Garden Street branch as separate from the rest of the so-called system, or in operating that system separate from the branch. If the council had intended to extend the time of the termination of the various grants to these railroads, it surely would have said so, and not left it to such vague and uncertain presumptions."

In my judgment the case presented here is not distinguishable from the case cited by reason of the fact (as stated) that the Garden Street line was independent from the other lines of the Cleveland Electric Railway Company, and that as such independent line it had no tracks upon Willson avenue; while the Cleveland City Railway Company had as part of its system tracks upon Willson avenue, the extension of which was provided by the ordinance in question for the purpose of creating a Cross-Town line. If the intention of the council in passing the Cross-Town ordinance is to be determined by the question whether a given line in the system could be operated independently of the extension (a proposition to which I am not prepared to assent), there appears no reason why the Garden Street line involved in the case of the Cleveland Electric Railway Company can be said to be capable of operation, independently of the Cross-Town feature, any more than can the Cleveland City Railway Company's system, which was in fact operated without the Cross-Town feature previous to the adoption of the ordinance therefor. Unless it was the intention of the council in passing the Cross-Town ordinance to extend the lives of all the lines connecting with the Cross-Town section, there is, to my mind, no room for a contention that such intention was expressed as to portions of these lines. That it was not the intention of the council to so extend all the lines has been authoritatively decided.

It is my opinion: That the Willson Avenue ordinance did not extend the franchises of the Woodland Avenue and West Side lines; that the latter franchises thus expired February 10, 1908; and that the receivers should be instructed accordingly.